UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LYNNETTE M. LANNON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CAUSE NO. 3:12-CV-353 TLS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

On June 26, 2012, Plaintiff, Lynette M. Lannon ("Lannon") filed her complaint in this Court. On October 29, 2012, Lannon filed an opening brief requesting this Court to enter judgment in her favor or remand this matter to the Commissioner. On November 30, 2012, the Defendant, Social Security Administration, filed a response. The undersigned now enters a report and recommendation pursuant to this Court's referral order, 28 U.S.C. § 636(b)(1)(B), and 42 U.S.C. § 405(g), based upon the record of this case, which includes the pleadings, motions, administrative record, and briefs of the parties.

**I.   PROCEDURE**

On July 29, 2009, Lannon filed an application for Title II disability insurance benefits, alleging a disability onset beginning November 3, 2008. The claim was initially denied on November 16, 2009, and again upon reconsideration on February 22, 2010. Lannon then filed a timely Request for Hearing on March 31, 2010. The hearing occurred on December 29, 2010, before an administrative law judge ("ALJ"). The ALJ found that Lannon met the insured status requirements of the Social Security Act through December 31, 2013, and that she had not

engaged in substantial gainful activity since November 3, 2008. Furthermore, the ALJ found that Lannon has the severe impairments of a history of congestive heart failure, coronary artery disease and hypertension. *See* 20 C.F.R. § 404.1520(c). The ALJ held, however, that Lannon does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. app. 1, subpart P, § 404.

In the instant case, the ALJ found that Lannon retained the residual functional capacity ("RFC") to perform her past relevant work as a loan officer and sales associate. *See* 20 C.F.R. § 404.1565. Specifically, the ALJ found that Lannon was able to perform a reduced range of light work, except that she can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch or crawl, and that she must avoid moderate exposure to hazardous machinery and unprotected heights. (Tr. 25). Based on these findings, the ALJ determined that Lannon was not disabled. (Tr. 29).

Accordingly, the ALJ issued a decision denying Lannon's application for disability benefits on January 10, 2011. (Tr. 30). Lannon requested review by the Appeals Council that was denied on April 26, 2012. (Tr. 1-6). As a result, the ALJ's decision became the Commissioner's final decision. 20 C.F.R. § 404.981; *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005). Lannon then filed the present action on June 26, 2012.

## II.  ANALYSIS

### A.  Facts

#### 1.  Medical Evidence

Lannon was born in 1960, and was fifty years old at the time the ALJ denied her application for disability benefits. She has a high school education and past relevant work as a

loan officer and sales associate. (Tr. 52). Lannon suffers from an assortment of heart conditions. She presented to the hospital on November 3, 2008, complaining of difficulty breathing, as well as swelling in her lower legs. Subsequent tests revealed severe coronary artery disease and diminished ventricular functioning. Based on these findings, Lannon underwent a coronary artery bypass graft surgery with repair of the mitral valve in her heart on November 11, 2008. (Tr. 245-47). Her final diagnoses included congestive heart failure exacerbation, coronary artery disease, hypertension, obesity, and high cholesterol. (Tr. 278). She was prescribed medications to treat excessive water retention, high blood pressure, and high cholesterol. (Tr. 279).

Lannon met with cardiologist Wail Asfour, M.D., on December 9, 2008. (Tr. 269). Dr. Asfour diagnosed congestive heart failure, coronary artery disease status-post coronary artery bypass grafting, and hypertension. (*Id.*). At a follow-up on December 24, 2008, Plaintiff reported feeling better, with no complaints of shortness of breath or chest pain, and Dr. Asfour's clinical exam was normal. (Tr. 268).

A cardiac stress test performed on January 5, 2009 revealed fair exercise tolerance with normal heart rhythm and blood-flow to the heart muscle. (Tr. 271). On February 18, 2009, Lannon underwent a study that showed a weakened left ventricle, an ejection fraction[1] estimate of 30-35%, mild aortic stenosis,[2] a moderately-enlarged left ventricle, restricted diastolic filling,

---

[1] The ejection fraction is a numerical percentage that measures the heart's efficiency at pumping blood. It is calculated by dividing the systolic volume of blood by the end diastolic volume in the heart. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 417 (15th ed. 1987).

[2] Aortic stenosis is a narrowing of the aorta that results in obstructed blood flow from the left ventricle of the heart into the ascending aorta. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 529 (15th ed. 1987).

increased ventricular wall thickness, mild tricuspid regurgitation,[3] mild aortic valve calcification, mild mitral annular calcification, moderate thickening of the mitral valve leaflets, and status-post mitral annular ring insertion. (Tr. 260, 274-75).

On March 9, 2009, Lannon complained of fatigue and reported attending cardiac rehabilitation three times per week. (Tr. 265). Lannon completed cardiac rehabilitation in April 2009. At an appointment with Dr. Asfour on May 11, 2009, Lannon complained of fatigue and dizziness. (Tr. 264). She also reported feeling tired often and had numbness in her left leg. (*Id.*). Dr. Asfour noted that she continued to have an ejection fraction of 30-35%. (*Id.*).

On June 2, 2009, Lannon underwent a cardiac study that revealed congestive heart failure, a left ventricular ejection fraction of 90%, congestive heart failure New York Heart Association Class II,[4] and coronary artery disease status-post bypass surgery. (Tr. 313-14). Dr. Asfour implanted a pacemaker into Lannon's heart during this procedure. (*Id.*).

On September 17, 2009, Lannon complained of cramping and fatigue in her lower legs and occasional dizziness, with no chest pain or shortness of breath. (Tr. 676). Lannon underwent a second heart study on October 13, 2009, that revealed a normal size left ventricle with an ejection fraction of 55%, a prosthetic mitral valve with mild mitral regurgitation, and no

---

[3] Tricuspid regurgitation occurs when blood flows from the right ventricle back into the right atrium due to improper functioning of the tricuspid valve of the heart. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 531 (15th ed. 1987).

[4] Doctors often describe a cardiac patient's symptoms using the New York Heart Association Functional Classification, which categorizes patients based on the symptoms they experience during physical exertion. The classification ranges from one to four, with a ranking of one indicating that the patient has no physical exertional limitations, while a ranking of four indicates the inability to perform any physical activity without discomfort. A ranking of two describes: "Patients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain." *Classes of Heart Failure*, AMERICAN HEART ASSOCIATION (Aug. 5, 2011), http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp.

pericardial effusion.[5] (Tr. 650). At her next appointment with Dr. Asfour on December 17, 2009, Lannon complained of shortness of breath with activity, dizziness, and fatigue with exertion. (Tr. 675). An examination revealed irregular sounds in the carotid arteries and a heart murmur. Dr. Asfour diagnosed congestive heart failure, coronary artery disease, hypertension, and mild peripheral artery disease. (*Id.*). An imaging study performed on December 21, 2009, showed that the bottom portion of Lannon's heart muscle was not receiving normal blood-flow during exertion, and that this issue subsided with rest. (Tr. 671). An echocardiogram study performed the following day revealed decreased left ventricular function, an ejection fraction of 35-45%, mild aortic stenosis, and a mildly enlarged left ventricle. (Tr. 666-67). An ultrasound study of Lannon's carotid arteries taken the same day showed abnormal blood-flow in both vertebral arteries with a narrowing in the right carotid artery. (Tr. 668-70). At a follow-up appointment with Dr. Asfour on January 5, 2010, Lannon denied experiencing shortness of breath, chest pain, or abnormal swelling. (Tr. 674).

On May 6, 2010, Plaintiff reported pain in both legs and occasional dizziness; however, Dr. Asfour's exam findings remained normal. (Tr. 725). Lannon met with Dr. Asfour in August 2010, and did not report chest pain, shortness of breath, or dizziness. She saw Dr. Asfour again in September 2010, and complained of swelling in her fingers and continuous dizziness. (Tr. 747). On January 10, 2011, Lannon reported swelling in her fingers and dizziness. Dr. Asfour examined Lannon and found no edema in her extremities. (Tr. 750).

### a. Dr. Asfour's Cardiac Impairment Questionnaire

---

[5] Pericardial effusion is the accumulation of excess fluid in the area surrounding the heart. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 538 (15th ed. 1987).

Dr. Asfour completed a Cardiac Impairment Questionnaire on May 28, 2010. (Tr. 720-23). He listed Lannon's diagnoses as congestive heart failure, status-post ICD pacemaker, coronary artery disease, hypertension, and status-post coronary artery bypass graft. (Tr. 720). He listed shortness of breath, fatigue, and dizziness as clinical findings that supported his diagnoses. (*Id.*). In the questionnaire, Dr. Asfour stated that Lannon's symptoms would increase if she were placed in a competitive work environment, and that her medications can cause dizziness and fatigue. (Tr. 721). He stated that Lannon could occasionally lift and carry up to ten pounds, and that her impairments would result in her missing work more than three times per month. (Tr. 722). Furthermore, Dr. Asfour opined that stress would increase Lannon's symptoms, resulting in lightheadedness, dizziness and fatigue, and that her symptoms were serious enough to constantly interfere with her attention and concentration. (Tr. 722). In closing, Dr. Asfour stated that Plaintiff's conditions rendered her incapable of even low-stress jobs. (*Id.*).

### b. Social Security Medical Consultant J. Sands, M.D.

On November 13, 2009, neurologist J. Sands, M.D., completed a physical RFC assessment for the Social Security Administration. Dr. Sands opined that Lannon can lift or carry ten pounds frequently and twenty pounds occasionally, sit up to six hours in an eight-hour workday, stand or walk up to six hours in an eight-hour workday, and no restrictions on the ability to push and pull. (Tr. 658). He also found that Lannon can never climb ladders, ropes, or scaffolds, and can occasionally climb ramps and stairs. Further, Lannon can occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 659). Dr. Sands noted that Lannon should avoid moderate exposure to heights and dangerous moving machinery, and that her symptoms were

consistent with her history of congestive heart failure. (Tr. 661-62). State agency physician Dr. Fernando Montoya affirmed Dr. Sands' opinion on February 22, 2010.

### 2. Claimant testimony

At her hearing before the ALJ, Lannnon testified that she was disabled due to her numerous heart ailments. She reported experiencing occasional chest pain, as well as dizziness, lightheadedness and anxiety. (Tr. 42-43). Lannon further testified that she tries to walk around a mile daily and that she can stand and sit in one position for around a half hour. (Tr. 43-44). She stated that her legs will become numb if she stays seated in one position for too long and that stress exacerbates her symptoms. (Tr. 44). Lannon testified that she is able to maintain her house, however, her chores need to be spread out during the week to avoid physical exhaustion. (Tr. 45). She stated that she is able to garden for fifteen to twenty minutes at a time. Lannon also testified that she needs to elevate her feet two to three times per day for fifteen minutes, and that she needs to take naps during the day three to four times per week. (Tr. 48). Furthermore, Lannon stated that she was unable to perform her past jobs after the onset of her heart condition because of side-effects from her medication such as mental confusion. (Tr. 49).

### B. Standard of Review

In reviewing disability decisions of the Commissioner of Social Security, the district court shall affirm the ALJ's decision so long as it is both supported by substantial evidence and free of legal error. 42 U.S.C. § 405(g) (2006); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). Substantial evidence is more than a mere scintilla of such "relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This Court will not substitute its own opinion for that of the ALJ's or re-weigh the evidence; however, it will conduct a critical review of the evidence, considering both the evidence that supports and detracts from the decision. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id.* The ALJ must explain his analysis of the evidence with specific detail and clarity so as to build a logical bridge from the evidence to the conclusion, but does not need to provide a "complete written evaluation of every piece of testimony and evidence." *Haynes*, 416 F.3d at 626 (*quoting Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)). This includes addressing uncontradicted evidence that supports a claimant's disability. *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). The ALJ's legal conclusions are reviewed *de novo*. *Haynes*, 416 F.3d at 626.

A claimant will only qualify for benefits if they are found "disabled" under the Social Security Act ("Act"). 42 U.S.C. § 423(a)(1)(E). The Act defines "disability" as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at § 423(d)(1)(A). Social Security regulations set forth a sequential five-part test to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a). This test requires the ALJ to consider whether: (1) the claimant is involved in substantial gainful activity; (2) the claimant has an impairment or combination of impairments that is severe; (3) the individual's impairment meets the severity or an impairment listed in the Social Security regulations as being so severe as to preclude substantial gainful

activity; (4) the impairment precludes the claimant from performing past relevant work; (5) the national economy lacks a significant number of jobs that the claimant has the capacity to perform. *Id.* The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

A finding of disability requires an affirmative answer at either step three or step five. *Briscoe v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). At step three, if the impairment meets any of the severe impairments listed in the Social Security Regulations, the impairment is acknowledged by the Commissioner, and the claimant is found to be disabled. 20 C.F.R. § 404.1509. If, however, the claimant's impairment does not meet a listing, the ALJ will then assess the claimant's RFC to determine if the claimant can perform past relevant work, or other work available in the national economy. *See* 20 C.F.R. § 404.1520.

### C. The ALJ's RFC determination is not supported by substantial evidence

The primary issue that this Court must resolve is whether the ALJ made a proper RFC determination. Lannon argues that the ALJ's opinion does not support her RFC determination because (1) the ALJ improperly discounted the medical opinion of Plaintiff's treating cardiologist, Dr. Asfour, and (2) the ALJ improperly evaluated the credibility of Ms. Lannon's testimony regarding her symptoms.

An individual's RFC is a judgment of their ability to perform physical and mental work activities on a sustained basis, despite having limiting impairments. 20 C.F.R. § 404.1520(e); SSR 96-8p. In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the case record. 20 C.F.R. §§ 404.1520(e), 404.1545. The record includes medical

9

signs, diagnostic findings, the claimant's statements about the severity and limitations of medical impairments, statements and other information provided by treating or examining physicians and psychologists, third party witness reports, and any other relevant evidence in the record. *See Martinez v. Astrue*, No. 2:09-cv-62-PRC, 2009 U.S. Dist. WL 4611415, at *9 (N.D. Ind. Nov. 30, 2009); SSR 96-7p.

### 1. The ALJ improperly discounted Dr. Asfour's medical opinion

Lannon seeks a remand for further consideration of the medical opinion of Dr. Asfour. She contends that the ALJ erred by not assigning controlling weight to his opinion because he was her treating physician. In determining the proper weight to accord medical opinions, the ALJ must consider factors including the claimant's relationship with the source of the opinion; the physician's specialty; the support provided for the medical opinion; and its consistency with the record as a whole. 20 C.F.R. § 404.1527(c). A "treating source" is a medical professional who provides medical treatment or evaluation to the claimant and has or had an ongoing relationship with the claimant. *Id.* An ongoing relationship exists when the medical record shows that the claimant saw the source frequently enough to be consistent with accepted medical practices for the treatment of the medical condition. *Id.*

An ALJ must give a treating physician's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and if it is consistent with other substantial evidence in the record. *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 404.1527(c)(2); SSR 96-8p; SSR 96-2p. Generally, ALJs weigh the opinions of a treating source more heavily because he is more familiar with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870;

20 C.F.R. § 404.1527(c)(2). A claimant is not entitled to benefits, however, merely because a treating physician labels her as disabled. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). A medical opinion may be discounted if it is internally inconsistent or inconsistent with other substantial evidence in the record. *Clifford*, 227 F.3d at 870.

Even though the ALJ is not always required to give a treating physician's opinion controlling weight, she must provide a sound explanation for a decision to adopt a contrary view. *See* 20 C.F.R. § 404.1527(c); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Jelinik v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Hofslien v. Barnhart*, 439 F.3d 375, 376-77 (7th Cir. 2006). Social Security Regulations state that more weight should be given to the opinion from a source that (1) examined the claimant, (2) treated the claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, and (5) offered an opinion that is consistent with the objective medical evidence and the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)(i), (ii).

In this case, the ALJ accorded "little weight" to Dr. Asfour's May 2010 opinion. In the decision, the ALJ briefly touched on Dr. Asfour's opinion in one paragraph, before concluding that his opinion was "based on the claimant's subjective complaints, and conflicts with the medical evidence of record as a whole." (Tr. 28). Instead, the ALJ gave "great weight" to the opinions of non-examining State agency physicians, asserting that they were "most consistent with the medical evidence as a whole." (*Id.*). This conclusory statement, however, makes it impossible to know what the ALJ found lacking in Dr. Asfour's opinion, which is a serious omission. *See Roddy*, 705 F.3d at 636. Moreover, the factors identified by the Social Security Administration militate in favor of giving Dr. Asfour's opinion of Lannon's impairments

11

significant weight. Dr. Asfour was Lannon's treating cardiologist for over a year and a half, he implanted a pacemaker into Lannon's heart, and he performed several heart studies related to her condition, including echocardiograms, a stress test, a cardiac nuclear imaging study, and a carotid duplex exam. (Tr. 274-75, 314-15, 666-70). In contrast, neither Dr. Sands nor Dr. Montoya specialize in heart conditions, and they made their determinations without physically examining Lannon. Furthermore, neither doctor provided an explanation for his conclusions, and neither discussed Lannon's medical evidence, or what evidence they actually reviewed. The ALJ may have properly considered the factors listed in 20 C.F.R. § 404.1527(c)(2). Her opinion, however, does not contain written evidence of this determination, and this Court cannot substitute its own judgment for that of the ALJ. On remand, the ALJ should explicitly consider the factors listed in 20 C.F.R. §404.1527(c)(2). Therefore, this Court finds that the ALJ's decision to discount Dr. Asfour's medical testimony was not supported by substantial evidence. *See Roddy*, 705 F.3d at 636.

### 2. The ALJ's credibility determination was not patently wrong

In addition to disputing the ALJ's assessment of Dr. Asfour's medical opinion, Lannon also challenges the ALJ's credibility determination, asserting that she applied the wrong legal standard in assessing Lannon's credibility. The ALJ is in a special position to hear, see, and assess witnesses, so his credibility determinations are given special deference and will only be overturned if they are patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012). An ALJ's credibility determination will only be considered patently wrong when it lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ must, however, "adequately explain his credibility finding by discussing specific reasons supported by

the record." *Pepper v. Colvin*, No. 12-2661, 2013 WL 1338123, at *14 (7th Cir. April 4, 2013), *(quoting Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). Furthermore, "careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p. It is the claimant's responsibility, however, to provide medical evidence showing how the impairments affect her functioning. 20 C.F.R. § 404.1529.

In assessing a claimant's subjective symptoms, particularly pain, the ALJ must follow a two-step process. SSR 96-7p. First, the ALJ must determine whether a medically determinable impairment exists that can by shown by acceptable medical evidence and can be reasonably expected to produce the claimant's pain or other symptoms. *Id.* Second, after showing an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms, the ALJ must evaluate the intensity, persistence, and limiting effects of the impairment to determine the extent to which the symptoms limit the claimant's ability to work. *Id.* Whenever a claimant's statements about the symptoms and limitations of their impairment are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on consideration of the entire case record. *Id.*

Lannon's main claim is that she suffers from a host of cardiac impairments with concomitant fatigue, dizziness, and anxiety. She further stated that she can walk around a mile in thirty minutes, sit or stand in one position for around thirty minutes, and lift between ten to fifteen pounds. (Tr. 43-44). Lannon also testified that she needs to elevate her legs and rest periodically during the day. In determining the credibility of Lannon's testimony regarding the

13

symptoms associated with her pain, the ALJ concluded that her medically determined impairments could reasonably be expected to cause the symptoms she alleged in her testimony. (Tr. 26). The ALJ found, however, that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the above [RFC]." (*Id.*). Lannon contends that the ALJ improperly evaluated the consistency of Lannon's testimony against the RFC instead of the evidence in the record. As the claimant correctly states, in *Bjornson v. Astrue*, the Seventh Circuit rejected an ALJ's use of the exact same boilerplate language used in this case. 671 F.3d 640, 644 (7th Cir. 2012). The court in *Bjornson*, however, criticized the ALJ not for the form of the boilerplate language, but for the ALJ's failure to link his conclusion to the evidence in the record. 671 F.3d at 644. Moreover, even though the ALJ used boilerplate language, this alone "does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper*, 2013 WL 1338123, at *14.

The Plaintiff identifies three separate grounds for which she claims the ALJ erred in her credibility determination. First, Lannon focuses on the ALJ's statement that she completed her activities of daily living "with no limitation." (*See* Tr. 27). Next, Lannon argues that the ALJ erred by improperly interpreting the results of an echocardiogram study. Finally, Lannon disputes the ALJ's conclusion that the side-effects she experiences from her medication are not significant. At her hearing, Lannon testified that she needs to limit the number of household chores she completes in one day due to fatigue, and that she needs to nap during the day three to fours times per week, and periodically elevate her legs. Additionally, Lannon testified that she can only garden for fifteen to twenty minutes at a time due to her impairments, and that her

14

medications cause dizziness and anxiety.

In this case, the ALJ began her credibility determination by focusing on Lannon's testimony regarding her heart conditions and side-effects from her medications, including dizziness, lightheadedness, and anxiety. (Tr. 26). Next, the ALJ discussed Lannon's testimony regarding her activities of daily living and her functional limitations, noting that Lannon exercises daily, and completes household chores throughout the week due to physical exhaustion. (*Id.*). After further discussing the relevant medical and opinion evidence, the ALJ concluded that Lannon's testimony regarding her symptoms was not entirely credible. (Tr. 29). In closing, she accommodated Lannon's impairments by limiting her to less than light work. (*Id.*).

In sum, the ALJ articulated the specific reasons he discounted Plaintiff's testimony, including her activities of daily living and her medical history. This Court will not reweigh the record evidence and substitute its judgment for that of the ALJ, as Lannon invites. *See Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997). The ALJ's reasons are properly supported by record evidence and are sufficiently specific to make clear the weight given to Lannon's testimony and the specific reasons for that weight. *See* SSR 96-7p. Therefore, the ALJ's credibility determination did not lack explanation or support, and so is not patently wrong, and will be upheld. *See Pepper*, 2013 WL 1338123, at \*14-15; *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Nonetheless, the Court notes that Lannon's arguments do succeed in drawing attention to a somewhat weak "logical bridge" regarding the ALJ's credibility determination. Therefore, the Court suggests that on remand, the ALJ specifically articulate and consider the factors set forth in SSR 96-7p in evaluating

Lannon's credibility.

## III. CONCLUSION

This Court concludes that the ALJ's decision to discount the medical opinion of Dr. Asfour was not supported by substantial evidence. Moreover, while the ALJ's credibility determination was not patently wrong, this Court recommends that the ALJ carefully articulate her reasoning for discounting Lannon's testimony using the factors set forth in SSR 96-7p. Therefore, the undersigned **RECOMMENDS** that Lannon's motion to reverse or remand the Commissioner's decision be **GRANTED**, and that the Commissioner's decision be **REMANDED**.

> **NOTICE IS HEREBY GIVEN that within fourteen (14) days after being served with a copy of the recommended disposition, a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**
>
> **SO ORDERED.**

Dated this 17th Day of April, 2013.

S/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge